FILED
2013 Feb-14  AM 09:05
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

YOLONDA FLOWERS,                )
                               )
              Plaintiff,        )
                               )
v.                             )        7:11-cv-01375-JEO
                               )
CITY OF TUSCALOOSA,            )
                               )
              Defendant.        )

## <u>MEMORANDUM OPINION</u>

This is an employment discrimination case.  Plaintiff Yolanda Flowers ("Plaintiff")

claims that the City of Tuscaloosa, Alabama (the "City") is liable under the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; 42 U.S.C. § 1983  ("Section 1983"); and

Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, for

disability discrimination and retaliation, as well as under Alabama tort law for infliction of

emotional distress.  (Doc.[1] 1 ("Complaint" or "Compl.")).  The cause comes to be heard on the

City's motion for summary judgment.  (Doc. 22).  Counsel for the parties have fully briefed the

issues.  (*See* Docs. 20 & 22, Motion for Summary Judgment by Defendant City of Tuscaloosa

("Dft. Summ. J. Mot."); Doc. 23, Plaintiff's Memorandum in Opposition to the Defendant's

Motion for Summary Judgment ("Pl. Opp. Brief"); Doc. 24, Defendant's Reply Submission

("Dft. Reply Brief")).  Upon consideration, the court[2] concludes that the City's motion for

summary judgment is due to be granted.

---

[1]References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet.

[2]The parties have consented to an exercise of plenary jurisdiction by a magistrate judge, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Doc. 26).

## I.      SUMMARY JUDGMENT STANDARDS

Pursuant to Rule 56 of the FEDERAL RULES OF CIVIL PROCEDURE, party is authorized to move for summary judgment on all or part of a claim or defense asserted either by or against the movant.  Under that rule, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. PROC. 56(a), Fed. R. Civ.  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).  Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. PROC. 56(c)(1)(A) & (B).  Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  In its review of the evidence, a court must credit the evidence of the non-movant and draw all justifiable inferences in the non-movant's favor.  *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000).  At summary judgment, "the judge's

function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## II.   FACTS[3]

Plaintiff is a black woman who worked for the City as a custodian.  She started in June 2001.  (Deposition of Plaintiff Yolanda Flowers ("Pl. Dep.")[4] at 77-79).  Plaintiff claims that, even before then, she had suffered from "mental problems."  (*Id.* at 89).  She explains that she was "depressed a lot" and "sad" about "the environment that [she] grew up in," which "took a toll" on her.  (*Id.* at 89-90).

During the first few years of her employment with the City, Plaintiff applied for several other posted jobs besides custodian.  Sometime between 2001 and 2003, for example, she applied for a 911 dispatcher position but was not selected.  (*Id.* at 187-88).   Plaintiff also applied some seven times to be a Parking Control Officer, with the last of those coming in July 2005.  (*Id.* at 178, 184-86).  She was interviewed on about five or six of those occasions but, again, was never selected.  (*Id.*)  In December 2006, she was likewise rejected a position as a "311" information operator.  (*Id.* at 178, 188-89).  Finally, at some unspecified time, Plaintiff applied with the Department of Transportation for a job whose duties included installing toilets.  (*Id.* 178-80). Before being interviewed for that post, however, Plaintiff voluntarily withdrew her name from consideration.  (*Id.* at 181).

---

[3]The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the plaintiff.  They are the "'facts' for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)."  *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

[4]Plaintiff's deposition is located at document 20-1 through 20-8.

In 2005, the City reassigned Plaintiff to perform custodial work at the Water Distribution Division of the Water and Sewer Department.  While there in April 2007, she was in a break room when she heard a Water Distribution crew employee, William Nalls, loudly remark to two male co-workers as they were walking in that the reason why "white women ... always get butt fucked and raped" is because they go "jogging in the park."  (Pl. Dep. at 191-94).  Plaintiff approached Nalls's supervisor and complained about the remark.  (*Id.*)  The issue reached the Human Resources Department, which promptly performed an investigation and provided sexual harassment training to the members of the department.  (*Id.* at 197-203).  Plaintiff acknowledges that is just what she had asked the City to do and that she was satisfied with that resolution.  (*Id.* at 203-06).

Several months later, according to the City's Associate Director of Facilities Maintenance, Doug Bullard ("Doug"[5]), the City reorganized the deployment of its custodians and assigned several of its buildings to a newly created "mobile crew."  (Affidavit of Doug Bullard ("D. Bullard Aff."), Doc. 20-11, at 3; *see also* Pl. Dep. at 207).  One of the buildings to which the mobile crew was to be assigned was the Water Distribution area where Plaintiff was working.  (Pl. Dep. at 207).  The City offered Plaintiff a position on the mobile crew, but she declined because its schedule would not have allowed her to be home each day when her children returned from school.  (*Id.*)  Following her refusal, Plaintiff's supervisor, Floyd Spencer, reassigned her on July 11, 2007, to perform cleaning duties at the City's Airport Terminal.  (D. Bullard Aff. at 3; Pl. Dep. at 207-08, 213).

---

[5]The parties have pointed to testimony from two City employees who both have the surname "Bullard." First, the City has filed an affidavit from "Doug Bullard," the City's Associate Director of Facilities Maintenance.  Second, Plaintiff has filed the deposition of "Sedell Bullard," who is the City's Associate Director of Human Resources.  The court will refer to these employees, who apparently are unrelated (Pl. Dep. at 118), as "Doug" and "Sedell," respectively.

On October 22, 2007, Plaintiff filed an EEOC charge against the City, her first.  (Doc. 20-9 at 9 ("the 2007 EEOC Charge")).  Plaintiff there asserted that her reassignment to the airport amounted to adverse action taken in retaliation for her sexual harassment complaint about Nalls, in violation of Title VII.  On March 23, 2008, the EEOC dismissed that charge and issued Plaintiff a right-to-sue notice.  (Doc. 20-9 at 10).  Plaintiff did not file a timely suit on that charge.

As early as 2003, Plaintiff had received counselings from her superiors regarding misconduct and work rule violations.  On February 17, 2003, Plaintiff received an "oral warning" from her supervisor, Floyd Spencer, for "conduct unbecoming a city employee" and exhibiting an "attitude toward a department head that [was] not acceptable."  (Doc. 20-9 at 19).  On March 9, 2004, Spencer administered a "verbal counseling" to Plaintiff about her consistent use of "[AVAIL][6] time and being absent from work with unpaid leave."  (Doc. 20-9 at 20 (footnote added)).  Likewise, in November 2007, while Plaintiff's 2007 EEOC Charge was pending, the Manager of the Airport Terminal, Wayne Cameron, voiced complaints about Plaintiff to her supervisors.  (D. Bullard Aff. at 3; Pl. Dep. at 219-21).  In particular, Cameron reported that Plaintiff was often tardy, that her cleaning work was rushed and substandard, and that she spent a lot of time sitting outside in her car talking on her cell phone.  (D. Bullard Aff. at 3).  As a result, Plaintiff's supervisors counseled her on or about November 28, 2007.  (*Id.*)  Plaintiff also contends that some unspecified point, she noticed that her City supervisor, Spencer, began to appear at the airport "quite often" and to closely monitor her work.  (Pl. Dep. at 226-27).

---

[6] "'AVAIL" is an acronym for annual vacation and illness leave. (Brian Butler Deposition ("Butler Dep."), Doc. 23-9, at 13-14).

Spencer, she says, "would hide a lot[,] and you would see him standing somewhere peeking at you." (*Id.* at 225-26).

In late August 2008, after the City had again acquired more office space, Plaintiff was again displaced from her assignment when the City designated the mobile crew to clean the Airport Terminal. (D. Bullard Aff. at 3; Pl. Dep. at 222). The City reassigned Plaintiff to the City Hall Annex and the Municipal Court building. (*Id.*) Plaintiff claims that while she was working that assignment Spencer continued to closely monitor and check her work. (*See* Pl. Dep. at 225-32). Plaintiff explains that when she was at City Hall, "it seemed like he was always there and not checking up on the other employees like [the custodians working] at the Police Department." (*Id.* at 227). "At one point," Plaintiff alleges, "[Spencer] began using a camera to take photographs of areas where work had not been done properly." (*Id.* at 229). Plaintiff also states that one time she "and [other] girls [on the custodial crew at City Hall] were in the attic and [Spencer] was up there fumbling with his camera." (*Id.* at 231).

Similar behavior was involved in a strange incident that occurred on December 26, 2008. That morning, Plaintiff arrived at City Hall and started cleaning in the Fire Department area. (Pl. Dep. at 232-33). Plaintiff then proceeded down to the basement with her supply cart to clean the bathrooms there. (*Id.* at 234-36). In the basement, Plaintiff worked her way through a dimly lit, secluded hallway. When she turned on a light, she became frightened when, looking through a vent on a closed supply closet door, she saw someone's hand holding what looked like a circular object that followed her as she moved. (*Id.* at 237-38, 242-44). Plaintiff ducked, thinking that the object might be a gun and that she might have to fight off an attacker. (*Id.* at 238, 244-45). Plaintiff opened the door and jumped back, only to find Spencer standing in the closet with a

camera.  (*Id.* at 239, 244-46).  Plaintiff asked him what he was doing and why he was taking

pictures of her.  (*Id.* at 247).  Spencer responded that he was "filming the other lady" and

suggested that he was doing nothing wrong.  (*Id.* at 247).  Plaintiff construed Spencer's "other

lady" remark as a reference to Glenda Gamble, an attorney for the City who Plaintiff had seen

that morning in a nearby area of the basement.  (*Id.* at 247-48).

  Plaintiff went to find Gamble and told her what had happened.  (*Id.* at 250).  Together

they went upstairs and spoke to Sedell Bullard ("Sedell"[7]), the City's Associate Director of

Human Resources.  (*Id.* at 250-251, 118-122).  Plaintiff was "hysterical" at that time, trying to

tell Sedell about what Spencer had done.  (*Id.* at 119).  When Sedell and Gamble tried to get

Plaintiff to relax, she told them, "[T]he reason why I can't calm down and talk loud is [that]

when I get excited my anxiety just takes over."  (*Id.* at 118).  Gamble suggested that Plaintiff

might use the Employee Assistance Program ("EAP"), an off-site counseling service available to

City employees at no cost.  (*Id.* at 119).  Plaintiff told them that she was already going to the EAP

on her own and that she was taking medication for her anxiety.  (*Id.* at 119-20).  Plaintiff

acknowledges that this was the first time that she told anyone with the City about having a

mental impairment.  (*Id.* at 121-22).

  On December 30, 2008, Plaintiff filed a grievance with the City.  (Doc. 20-9, at 22-23

(the "2008 Grievance")).  Plaintiff's grievance included the following: "I feel that my pictures

(sic) being taken in the dark is a violation.  I would call it harassment and stalking, being that I

just filed a retaliation with EEOC and to have this happen a few months later after the suit was

dropped."  (*Id.* at 22).  When asked on the form what management should do, Plaintiff answered,

---

[7]*See* Note 5, *supra*.

"Get rid of the person or persons in charge and of such an act (sic) and never allow anything like this to happen to anyone." (*Id.*)

After investigating, the City gave Spencer an "oral warning" regarding the incident but declined to fire him.[8] (Sedell Dep. at 20-23). Afterwards, the only contact Plaintiff recalls having with Spencer was that he once asked her to come to his office about some unspecified matter. (Pl. Dep. at 254-55). Plaintiff did not attend that meeting, however, because she had been told by the City Clerk that she did not have to go. (*Id.* at 255). On April 6, 2009, Spencer went on disability leave due to an unspecified medical condition, and he retired without ever returning to work. (Doug Aff. at 4).

Meanwhile, on February 10, 2009, Plaintiff had filed her second EEOC charge against the City, again claiming retaliation in violation of Title VII. (Doc. 20-9 at 11, Doc. 23-4 ("2009 EEOC Charge")). Plaintiff cited a sexual harassment complaint, which appears to have related to the same break room episode that formed the basis of her 2007 EEOC charge, as well as a complaint she made to Human Resources in September 2007 about being stationed at the Airport. (*Id.*) Plaintiff further claimed she was "disciplined for time and attendance" in late November 2008 "without being given a reason." (*Id.*) Finally, Plaintiff alleged that she had complained about her supervisor taking pictures of her, but the City "did not agree to my grievance regarding the supervisor's actions." (*Id.*) The EEOC dismissed the charge and mailed Plaintiff a right-to-sue notice on April 1, 2009. (Doc. 20-9 at 12). She again did not file a timely

---

[8]No testimony from Spencer is in the record, so there is no explanation from him about what he was actually doing in the closet on the day in question. Sedell indicated in his deposition that Spencer provided the City with a statement about the incident. (Sedell Dep. at 21-23). However, no such statement is in the record, and Sedell did not testify as to his recollection of its content. Nor is there evidence explaining what the City determined had occurred in connection with the incident or why Spencer was disciplined as he was.

suit based on her charge.

In about October 2009, Plaintiff was again reassigned, this time to the second floor of the Municipal Court building and the City's newly opened "Intermodal Facility."  (Doug Aff. at 4; Pl. Dep. at 276-79).  By that time, Jessie Hall had become Plaintiff's supervisor, and Plaintiff recalls that she also reported to James "Floyd" Rice and  Vonda Prince.  (*Id.* at 281-83).  The area of the Intermodal Facility assigned to Plaintiff included space that the City leased to the Tuscaloosa County Parking and Transit Authority ("Transit Authority"), an agency of the county, not the City.  (*Id.*; see also D. Bullard Aff. at 4-5). Over the next few months, Jimmie Cain, the manager of the Transit Authority, lodged complaints with Plaintiff's City supervisors about deficiencies in her work.  (*Id.* at 281-286; Doug Aff. at 5).  Plaintiff's supervisors, in turn, responded by counseling her about such matters, including avoidance of work and unapproved breaks, and they also sought to more closely monitor her work.  (*Id.* at 282-84; Doug Aff. at 5).

In late January 2010, Plaintiff complained to Doug and his superior, Clif Penick, the City's Facilities Maintenance Director, that Hall "was just wearing [her] down" by constantly following her around during the day and scrutinizing her work.  (Pl. Dep. at 126, 130-34). During that meeting in Penick's office, Doug became upset when Plaintiff "c[ouldn't] calm down," and he said that she "needed to be fired."  (*Id.* at 133).  Doug took Plaintiff to the Human Resources Department, where they had a discussion with Sedell and Ken Dockery, another HR employee, during which Plaintiff again mentioned that she suffered from anxiety.  (*Id.* at 127-28, 130, 133, 138-39).  Sedell told Doug that the City "can't fire [Plaintiff] just because she talks loud" (*id.* at 133) and further advised that Plaintiff's supervisors should similarly check the work of other janitorial employees as well, rather than just singling out Plaintiff.  (*Id.* at 137).

9

Soon thereafter, the City received additional complaints from Cain about Plaintiff's work. (Pl. Dep. at 286-287, 301; Doug Aff. at 5). As a result, on January 28, 2010, Plaintiff was counseled about her "inattention to duty and demeanor." (Doc. 23-12). When Plaintiff became upset over Cain's complaints and the associated counseling, Doug recommended that Plaintiff be suspended. (Pl. Dep. at 301; *see also* Doug Aff. at 5). Ultimately, however, the City offered Plaintiff a choice of either being suspended or attending mandatory EAP counseling. (Pl. Dep. at 301, 304-05). Plaintiff picked the latter, and on February 2, 2010, the City referred her for the counseling. (Pl. Dep. at 141-43, 286-87; Doc. 23-12).

In late July 2010, the City received still more complaints from Cain about Plaintiff. (Doug Aff. at 6). Those prompted Rice to give Plaintiff a written reprimand on August 2, 2010, charging as follows:

> On January 28, 2010 you were counseled in regard to your inattention to duty and demeanor and you were referred to EAP counseling on February 2, 2010. You have failed to attend regularly scheduled counseling sessions with EAP as required. You failed to turn in EAP appointment cards and return to work notices as required. Based on complaints that have been found to have merit, the quality and quantity of your work and your general demeanor at the intermodal facility fails to meet standards. The same issue was addressed on March 19, 2010. On July 15, 2010, you were found to have left your job station without permission, and failed to answer employer provided Line phone when called.

(Doc. 23-12).

That same day, August 2, 2010, Plaintiff filed a grievance with the City contesting the write-up. (Doc. 23-13 at 1-6 (the "2010 Grievance")). On the grievance form, Plaintiff complained that she had endured "false accusations, constant harassment and write ups" that had been "continuous" since January 28, 2010. (2010 Grievance at 1). Plaintiff further stated that she was seeking "fair treatment" and that the grievance was based upon "harassment of

10

everything that I am being accused of doing or not doing." (*Id.*)  With respect to her failure to answer her phone, Plaintiff claimed that there had been a "mix up" and asked that phone logs be pulled to verify that. (*Id.*).  She likewise asked the City to "pull logs on employees who have not been written up due to a mistake and see differences to show [that she had] been written up about everything that [she could] imagine." (*Id.*)  Plaintiff added, "I cannot spend all day at [the] Transit [Authority] because I have to do cleaning twice at Municiple (sic) Court." (*Id.*)  Plaintiff also supplemented her form grievance application (*id.* at 1) with handwritten notes, some dated the same day (2010 Grievance at 2-3) and others the next, August 3, 2010. (*Id.* at 4-6).  In those, Plaintiff identified that she was taking issue with her supervisors with the City, namely, Doug, Rice, Penick, and Prince. (*Id.* at 2).  Plaintiff complained that she had been sent to EAP counseling because of "perceived ... mental issues." (*Id.* at 2).  While Plaintiff admitted that she had missed two of those appointments, she insisted that both were justified. (*Id.*)  Plaintiff also added, "I feel that I am being harassed by these authority figures for what reasons I don't know." (*Id.* at 3).  In the notes dated August 3, 2010, Plaintiff complains she had been "constantly under surveillance (sic)" and "followed around for two day[s] to see if I am doing my job." (*Id.* at 4).  She concluded:

> I have sought counseling [and] I have been ... labeled as a "mental person" [and am] constantly being written up for the smallest of detail as taking medical leave and using my avail time for doctors having me off work.  I can't focus on my personal life due to being harassed every other day on my job.  I have to be too careful when doing my daily work and this causes stress where I might forget to put a bag in a trash can.  I feel as if they have burned me out.  I am always tired from having to be very attentive to detail and [having] more work added. ... I am at times to (sic) scared to take a break because I feel like I am being followed or watched.  ... I have been lied on and felt as though I was forced to sign paper work when they mention human resources will get involved. ... I am tired.  I have headaches and [am] very depressed all the time for the years I have worked for the

11

> City of Tuscaloosa.  ... I feel as I am being pushed in a corner or pushed out the door due to all of this.  ...  I am starting to stress my kids with the everyday stress at work.  We can't have a normal life they said because I am always tired or crying.  All I can say now is I have been pushed to the limit and need someone to help because this is just a piece of the puzzle ... I have been prescribed pills during this process and stopped taking them due side effects and did not want to get addicted.  I don't understand why someone would want to get rid of my job. ... I love my family and if I can't focus enough to be there for them no one will.  I am they have and I am <u>tired</u>!

(2010 Grievance at 5 (emphasis original)).

On August 6, 2010, Plaintiff's Department Head, Alan Boswell, issued a response denying Plaintiff's grievance.  (Doc. 23-13 at 7)[9].  He determined that there was "no evidence or cause" to support that Plaintiff had been harassed by any of her supervisors or that they had caused her to be harassed.  (*Id.*)  He noted "evidence of complaints from other city departments pertaining to [Plaintiff's] work and attitude" that tended to corroborate allegations of her deficient performance.  (*Id.*)  He further discussed that while Plaintiff claimed in her grievance that she had missed only two EAP appointments, evidence showed seven missed appointments, only one of which had been canceled by the EAP.  (*Id.*; *see also* Doc. 23-14).  Finally, he rejected Plaintiff's complaint about how much time she was being required to spend at the Transit Authority.  (Doc. 23-13 at 7).  He recognized that Plaintiff was only required to spend five hours per day at the Transit Authority and three hours at the Municipal Court, which was, he said, enough time to perform her duties at each, noting that all "custodial employees are basically

---

[9]The grievance response itself is unsigned and does not otherwise indicate the identity of the "Department Head" that authored it.  However, the line for the "Department Head Signature" on Plaintiff's written reprimand that prompted the subject grievance contains a signature that reads "Alan Boswell,"  (Doc. 23-12 at 2).  The City of Tuscaloosa's webite lists Alan Boswell as the City's "Chief Building Official."  http://www.tuscaloosa.com/e-services/Staff-Directory/planning-and-development-services.  Also, Plaintiff's request to appeal her first grievance, from December 2008, also states that she understood that denial to have been made by her "Dept. Head Allen (sic) Boswell."  (Doc. 23-17).

given the same amount of floor area ... to work." (*Id.*)

Two days later, August 10, 2010, was the last day that Plaintiff served as an active status employee for the City.  That morning, she reported for her shift at the Transit Authority area of the Intermodal Facility.  That area of the building complex was accessed through a main, "outside" door operating on a "swipe" card or "badge" key system.  Then inside the Transit Authority space were individual offices that had traditional metal locks and keys.  Although Plaintiff was unable to recall whether her swipe badge to the outer door functioned on this particular day, she admits that she was able to access the Transit Authority space.  (Pl. Dep. at 344-46).  Plaintiff first cleaned the bathrooms there and then proceeded to the area where the individual "inside" offices were located.  On this morning, however, Plaintiff found that of the ten or so offices, about three or four were locked.  Accordingly, she could not clean them.

Plaintiff became extremely frustrated.  (Pl. Dep. at 351).  She described feeling "like they wouldn't allow her to [do her job] when [she] was there to do it," and that the situation "was holding [her] back" from completing her work before having to leave to go perform her duties at the Municipal Court building.  (*Id.* at 353-54).  Also fearing that Cain or someone else might complain about her again, Plaintiff admits that she became very agitated and angry.  She phoned Human Resources and spoke to an employee in that department, Dawn Barnes.  Plaintiff began crying, yelling, and screaming that Cain had locked her out of the Transit Authority.  (Pl. Dep. at 364-65; Doc. 23-24).  Barnes instructed Plaintiff to come to her office, which was a block down the street at City Hall.  Plaintiff set about to do so, but while departing the Intermodal Facility, Plaintiff saw her supervisor, Rice, and she began yelling at him too.  Police arrived on the scene and escorted Plaintiff to the Human Resources Department.  (*Id.* at 353, 364-67).  Plaintiff went

to Barnes's office, and she arranged for Plaintiff to see her regular EAP counselor, psychologist Vanessa Graves.  (*Id.* at 373).

Plaintiff left City Hall and went to see Dr. Graves at her practice in Northport.  Dr. Graves recommended that Plaintiff go to the Emergency Room at the Northport Medical Center for an evaluation.  (Pl. Dep. at 382-84; Doc. 23-23; Doc. 23-24).  The ER physician appears to have referred Plaintiff, in turn, to Natasha Harder, M.D., a family practitioner at the University Medical Center in Tuscaloosa.  (Pl. Dep. at 385; Doc. 23-18; Doc. 23-19).  Dr. Harder saw Plaintiff the next day, August 11, 2010.  (Pl. Dep. at 388).  Based on that examination, Dr. Harder completed a report dated August 17, 2010, in which she diagnosed Plaintiff with a "chronic condition" described as "severe depression [with] symptoms of irritability, fatigue, crying spells, anger, anxiety and panic attacks." (Doc. 23-18, Doc. 23-19 at 1[10]).  Dr. Harder opined that such condition had likely commenced in about October 2007 and that it rendered Plaintiff presently unable to perform work of any kind.  (Doc. 23-18).  She noted a probable duration of incapacity until October 1, 2010, with a re-evaluation scheduled for September 29, 2010.  (Doc. 23-19 at 1; Doc. 23-20). On August 16, 2010, Plaintiff applied to the City for extended leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., which the City granted, retroactive to August 11, 2010.  (Pl. Dep. at 73, 388-89).

On September 20, 2010, while still out on leave, Plaintiff filed her third and final EEOC charge against the City.  (Doc. 23-16 at 1 (the "2010 EEOC Charge")).  This time, Plaintiff

---

[10]In its brief the City recognizes the existence of Dr. Harder's reports and similar medical records addressing aspects of Plaintiff's alleged disability.  However, the City has not filed such records in connection with its motion, and the City seems to suggest that those documents constitute "inadmissible hearsay." (*See* Dft. Summ. J. Mot. at pp. 12-13, ¶¶ 40-41).  Plaintiff disputes that evidentiary characterization and asserts that such medical records are admissible. (Pl. Opp. Brief. at p. 7, ¶¶ 41, 42). For instant purposes, the court assumes that all such materials are admissible and may be considered at summary judgment.

claimed that the City had violated both Title VII and the ADA, by discriminating against her because of disability and by retaliating against her.  (*Id.*)  Plaintiff alleged that since filing her EEOC charges against the City in 2007 and 2009, the "terms and conditions of [her] employment [have] diminished greatly and grow worse day by day."  In particular, Plaintiff asserted that she had endured, among other things, "unwarranted write-ups and threats of termination for the least little things" and that she was "being watched and ... scrutinized to the point of ... being afraid to take a break."  (*Id.*)

Several days later, on September 24, 2010, Plaintiff was examined by Dr. Beverly Bell-Shambley, a psychologist, to whom Plaintiff was referred by the City.  (*See* Doc. 23-19).  Based on that exam, Dr. Bell-Shambley generated a "Fitness for Duty" report, as well as an attached "Medical Evaluation Form," both dated September 26, 2010.  (*Id.*)  In the Fitness for Duty report, Dr. Bell-Shambley recognized that Plaintiff presented "with symptoms of anxiety and depression," which rendered it "doubtful that [she] will be able to maintain proper composure with sustained contact with individuals she perceives as trying to harm or mistreat her.  The potential for emotional outbursts is moderate to high."  Dr. Bell-Shambley further opined:

> There are no apparent limitations in her ability to perform the essential functions of her job, however, her perception that she has been and will be targeted and mistreated has resulted in a degree of paranoia and negative apprehension, that will compromise her communication and interpersonal interactions, particularly with supervisors.
>
> * * *
> She is able to perform the essential functions [of her job.] She is experiencing symptoms of anxiety and depression that compromise her tolerance for frustration, interpersonal communication and concentration.  She is viewed as being emotionally fragile and too unstable to return to her work environment at the present time.

If her employer felt there was any basis to her complaints about specific individuals, reassignment might be a consideration.

As a result of her evaluation, Dr. Bell-Shambley ultimately "recommended that the employee be off work." On the attached Medical Evaluation Form, Dr. Bell-Shambley likewise marked a box next to the following statement: "Patient is totally incapacitated at this time." However, Dr. Bell-Shambley also drew a line striking out the word "totally," without further elaboration. She then noted that Plaintiff would be re-evaluated in 60 days.

On November 30, 2010, Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits. (Plaintiff's Responses and Objections to the City's First Interrogatories and Requests for Production ("Pl. Disc. Resp."), Doc. 20-10, at 7). Plaintiff acknowledges that, in so doing, she represented to the Social Security Administration ("SSA") that she was unable to do any work, "according to [her] doctor." (Pl. Dep. at 389-92). In March 2011, the SSA awarded SSDI benefits to Plaintiff, retroactive to August 10, 2010, and she has continued to receive those benefits ever since. (*Id.* at 391).

In a letter dated April 25, 2011, the City's Director of Human Resources, Brian Butler, notified Plaintiff that, after reviewing her Fitness for Duty evaluations, the City had determined that she would be unable to return to work. (Doc. 23-21). He further stated that the City wanted to discuss the possibility that Plaintiff might resign her position in lieu of a termination before the City Personnel Board. (*Id.*) Despite that letter, Plaintiff has continued to be formally employed by the City, but only on an inactive, "no-pay" status. (Butler Dep. at 70).

On January 21, 2011, the EEOC mailed Plaintiff a right-to-sue notice advising that the agency had dismissed the charge she filed with agency on September 20, 2010. (*See* Doc. 23-

16).  On April 22, 2011, Plaintiff filed her three-count Complaint in this civil action.  In Count I, Plaintiff asserts a claim for disability discrimination. In Count II, Plaintiff claims that after she filed EEOC charges in 2007 and 2009, the City unlawfully retaliated by giving her "numerous write-ups and [making] multiple threats of termination."  Finally, Plaintiff's claim in Count III is captioned, "Mental and Emotional Distress."  Following the close of discovery, the City filed its instant motion for summary judgment, which is now ripe for decision.

## III.   DISCUSSION

### A.     Count I - ADA Disability Discrimination

Plaintiff alleges in this count that the City discriminated against her because of an otherwise unspecified "mental disability." (Compl. ¶ 20).  Such is based on her allegation that the City "refused to allow [her] to return to her former position or any other position because of her disability" (*id.* ¶ 18), when, "with reasonable accommodation she can continue to perform her job duties."  (*Id.* ¶ 12).  Plaintiff also seems to claim that she was subjected to disability discrimination founded on allegations that "from the time of her diagnosis to the day of her termination, Plaintiff attempted [unsuccessfully] to be placed in available suitable positions at the [City's] facilities on numerous occasions." (*Id.* ¶ 17; *see also id.* ¶ 15 ("Plaintiff has made numerous requests for a transfer and has sought other employment opportunities with the [City for] which she qualified.")).  Plaintiff suggests in her pleading that this failure-to-accommodate theory is cognizable under three different federal statutes: the ADA, Title VII and § 1983.  (*Id.* ¶¶ 1, 5, 19, 20; *see also* Pl. Dep. at 16 (where Plaintiff's counsel suggests that the "failure to accommodate claim" is brought "[u]nder Title [VII]")).  Both sides now proceed at summary judgment, however, by addressing the cause of action only in its most natural guise, namely, as a

17

claim under the ADA.  Accordingly, the focus of the court's analysis is likewise, with any related Title VII and § 1983 claims deemed abandoned.[11]  *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001); *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

Section 102(a) of the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  In order to establish a prima facie case of discrimination under the ADA, a plaintiff has the burden at trial to show:  (1) that she is disabled; (2) that she is a qualified individual; and (3) that she was subjected to unlawful discrimination because of her disability.  *Holly v. Clairson Industries, LLC*, 492 F.3d 1247, 1255-56 (11th Cir. 2007).  In the context of the ADA, the "term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  Further, unlawful discrimination because of a disability includes

> not making reasonable accommodations to the known physical or mental
> limitations of an otherwise individual with a disability ... unless [the employer]

---

[11]In any case, Title VII does not proscribe discrimination because of disability.  *See Clifton v. Georgia Merit System*, 478 F. Supp. 2d 1356, 1361 (N.D. Ga. 2007); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007).  Likewise, while Plaintiff pleads that the City's failure to accommodate her disability was "in violation of ... 42 U.S.C. § 1983" (Compl. ¶ 20), that statute is merely a procedural vehicle for enforcing substantive federal rights found elsewhere; there is no cause of action for a "violation of" § 1983 itself.  *Gonzaga Univ. v. Doe*, 536 U.S. 274, 285 (2002).  One might assume that Plaintiff had in mind a § 1983 claim conceiving of the City's failure to accommodate her disability as discrimination amounting to a violation of the Equal Protection Clause of the Fourteenth Amendment.  It is questionable whether Plaintiff pled such a claim.  But even assuming that she had, the Equal Protection Clause, unlike the ADA, generally does not require accommodation of disabilities.  *See Board of Trustees v. Univ. of Ala. v. Garrett*, 531 U.S. 356, 367-368 (2001); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n. 6 (11th Cir. 2008).  Plaintiff is also foreclosed from bringing a § 1983 claim based upon an alleged violation of the ADA.  *See  Holbrooks v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1531 (11th Cir. 1997).

can demonstrate that the accommodation would impose an undue hardship on the operation of the [employer's] business ....

42 U.S.C. § 12112(b)(5)(A); *see also* 29 C.F.R. § 1630.9(a).  Accordingly, an employer's failure to reasonably accommodate an employee's known disability itself constitutes unlawful discrimination under the ADA, so long as the employee is otherwise qualified, unless the employer can show undue hardship.  *Holly*, 492 F.3d at 1262.

To the extent that Plaintiff is complaining about a failure to accommodate an alleged disability up through her final day of active employment, August 10, 2010, the City argues that she cannot establish any of the elements of a prima facie case, including that she was "disabled" for purposes of the ADA.  The City does not appear to dispute that Plaintiff has been so disabled since her last-worked date insofar as she is making a corresponding claim that the City failed to accommodate by not reinstating her to active, paid employment.  The City argues, however, that Plaintiff cannot show that she has been a "qualified individual" since she stopped working, given that she has been receiving SSDI benefits for the entirety of that period.  The City also argues that Plaintiff's claim fails because she never requested an accommodation and because she cannot show that any accommodation she now cites is reasonable.

Of the approximately three-and-a-half pages of argument in Plaintiff's brief relating to her disability discrimination claim, about three pages are devoted to the proposition that she had a "disability" within the meaning of the ADA.  (*See* Pl. Opp. Brief at 12-15).  Even indulging Plaintiff that assumption, however, the City is entitled to summary judgment on her ADA claim.  As further explained below, the court agrees with the City that Plaintiff cannot show that the accommodations she now proposes were reasonable and thus required under the ADA.  The court

19

also agrees with the City that the evidence fails to show that Plaintiff actually requested an accommodation of her disability, at least not while she was actively employed, if ever.  Finally, the court also agrees with the City that Plaintiff cannot show that she has been a "qualified individual" under the ADA at any time since she last worked.

While the ADA requires an employer to make "reasonable accommodations" for an employee's known disability, "an employer is not required to accommodate an employee in any manner in which that employee desires." *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997)).  Rather, an "accommodation is 'reasonable' and necessary under the ADA ... only if it enables the employee to perform the essential functions of the job." *Holly*, 492 F.3d at 1256 (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1259-60 (11th Cir. 2001); *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir.1998); 29 C.F.R. § 1630.2(o)(1)(ii)).  Thus, a plaintiff "(1) as part of her burden of production, must identify an accommodation that would allow her to perform her job duties and (2) as part of her burden of proving her case, must establish that such an accommodation is reasonable." *Willis v. Conopco, Inc.*, 108 F.3d 282, 283 (11th Cir. 1997).  Moreover, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999).  Instead, the plaintiff must show that she actually demanded an accommodation of her disability from the employer and was refused. *Gaston*, 167 F.3d at 1363-64; *Branscomb v. Secretary of Navy*, 461 Fed. App'x 901, 905 (11th Cir. 2012); *Knowles v. Sheriff*, 460 Fed. App'x 833, 835-36 (11th Cir. 2012); *see also Schwarz v. City of Treasure Isl.*, 544 F.3d 1201, 1219 (11th Cir. 2008) ("The duty to make a reasonable

20

accommodation does not simply spring from the fact that the [plaintiff] wants such an accommodation made." (quoting *Prindable v. Association of Apt. Owners*, 304 F. Supp. 2d 1245, 1258 (D. Hawaii 2003)).

Plaintiff now identifies two types of accommodation that she claims the City unlawfully failed to provide. First, she says that the City should have transferred her to a position or assignment that involved a "less stressful environment." (Pl. Dep. at 14-15). Second, she vaguely states that she wanted to be "working as a team" with one or more other custodial employees rather than by herself. (*Id.* at 15). These are examined in turn.

With regard to the possibility of reassignment as a reasonable accommodation, the Eleventh Circuit has stated:

> The ADA lists as examples of reasonable accommodations "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B); *see* 29 C.F.R. § 1630.2(o)(2)(ii). As the list indicates, the ADA may require the employer to "reassign," *i.e.*, transfer, the disabled employee to a vacant position as a reasonable accommodation. The reassignment duty, however, does not require the employer to bump another employee from a position in order to accommodate a disabled employee. *See Willis*, 108 F.3d at 284. Nor does it require the employer to promote a disabled employee.

*Lucas*, 257 F.3d at 1256 (further citation omitted).

Plaintiff claims that the City could have "transferred [her] to another custodial position" and that doing so would have allowed her anxiety to remain under control and for Plaintiff to perform the essential functions of the job. (Pl. Opp. Brief at 15). However, Plaintiff has not identified any particular custodial position that was supposedly vacant at any time material to her failure-to-accommodate claim, never mind present evidence of such a custodial position vacancy.

Plaintiff alternatively says that she could have been transferred into one of the non-custodian

positions for which she had previously applied, including a "waste water position" with the

Department of Transportation or a parking control officer position.  (*Id.*)  It is true that Plaintiff

applied for those and several other posted job openings with the City in the first few years of her

employment.  (Pl. Dep. at 177-89).  However, Plaintiff's last such application and rejection

occurred in December 2006, more than two more than two years before she first told anyone with

the City anything about having a mental impairment or condition in December 2008.[12]  Plaintiff

has presented no evidence that any of those jobs, or any other non-custodial positions for which

she was qualified, were vacant at any time relevant to her failure-to-accommodate claim.

Because Plaintiff has not identified any vacant position into which the City could have

transferred her, Plaintiff has failed to show that reassignment was a reasonable accommodation.

*See Lucas*, 257 F.3d at 1256-57; *see also Ivey v. First Quality Retail Service*, 2012 WL 4219941,

*5 (11th Cir. Sept. 21, 2012); *Anderson v. JPMorgan Chase & Co.*, 418 Fed. App'x 881, 884 n.2

(11th Cir. 2011).

      Plaintiff's other proposed accommodation, working as part of a "team" with another

custodial employee, is likewise not "reasonable."  Plaintiff suggests that she thought such an

arrangement "would be best" so that she would have "somebody to help [her] out," based on an

apprehension that she was at times "working around clients that came from" public mental health

facilities.  (*Id.* at 14-16).  While Plaintiff might have desired to have someone else working

around her, there is no evidence that any safety concerns on her part either stemmed from her

---

[12]Plaintiff admits that she has no evidence that her non-selection for those positions up
through 2006 had anything to do with disability or any other unlawful motive.  (Pl. Dep. at 186-
89).

22

alleged mental disability or actually prevented her from perform her job functions, essential or otherwise.  "An accommodation that does not enable the employee to perform an essential function of his position is facially unreasonable and is not required by the ADA."  *Holly*, 492 F.3d 1262 n.16.

Plaintiff seems also to testify that she wanted to work alongside someone so they could help her perform her cleaning assignments.  Specifically, she stated that the reason that she wanted to work with someone was because "it would be better [and] would have let me work at ... the pace that we were trying to work together and ... that way we can get the work done on time and how its supposed to be done."  (*Id.* at 378).  There is no evidence, however, that any inability on Plaintiff's part to properly or timely complete her regularly assigned cleaning tasks, which are an essential part of her custodian position, was actually caused by her anxiety or depression.  To the contrary, Plaintiff testified that she did not let her "mental issues" impact her ability to do her job.[13]  (*Id*. at 113-14).  There is likewise no evidence that assigning another employee to work with Plaintiff either (1) was necessary to enable her to perform the essential functions of her job while she was actively working or (2) would have thereafter allowed her to perform her essential job duties such that she could have been reinstated.  Because the record fails to show that this accommodation was needed to enable Plaintiff to perform the essential functions of her job, it is not reasonable.  *Holly*, *supra*.

Furthermore, while an employer may be bound to provide "job restructuring" as an accommodation, such is required only where "reasonable."  *Lucas*, 257 F.3d at 1259.  Thus, "employers are not required to transform the position into another one by eliminating functions

---

[13]She also stated that her "mental issues" did not cause any of her disciplinary issues.  (*Id*. at 114).

23

that are essential to the nature of the job as it exists." *Id.* at 1260.  If Plaintiff is asking that the City hire or assign another employee to work with Plaintiff and permanently assist her in performing her regular cleaning duties generally, such is not reasonable because it goes beyond the job restructuring required by the ADA.  *See Barton v. Board of Regents of Univ. Syst. of Ga.*, 478 Fed. App'x 627, 630-31 (11th Cir. 2012); *Dickey v. Dollar Gen. Corp.*, 351 Fed. App'x 389, 392 (11th Cir. 2009).

Plaintiff's ADA disability claim also fails because she did not actually request an accommodation.  Plaintiff claims that she did make such a request.  In support, she cites her deposition testimony relating to conversations she had with City managerial personnel during her employment, the first occurring in December 2008, in which she advised that she suffered from anxiety problems, for which she was voluntarily going to EAP counseling and taking prescribed medication.  In doing so, Plaintiff appears to be operating under the assumption that the City's mere awareness of a mental impairment that may rise to the level of a disability triggered an obligation make an affirmative "offer" of some sort of unspecified accommodation to Plaintiff. (*See* Pl. Opp. Brief at 9, ¶¶ 1, 2 ("Plaintiff put [the City] on notice that she had a disability that required an accommodation ... [but] Plaintiff was not offered an accommodation.").  However, "the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made."  *Gaston*, 167 F.3d at 1363.  Although the Eleventh Circuit has not "determined precisely what form the request [for reasonable accommodation] must take," *Holly*, 492 F.3d at 1261 n. 14, that court has indicated that "for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant must have enough information to know of both the disability and desire for an accommodation, or circumstances

24

must at least be sufficient to cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation,'" *United States v. Hialeah Hous. Auth.*, 418 Fed. App'x 872, 876 (11th Cir. 2011) (quoting *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010) (quotation marks omitted)); *see also Salser v. Clarke County Sch. Dist.*, 802 F. Supp. 2d 1339, 1355-56 (M.D. Ga. 2011).

At least insofar as her discrimination claim pertains to the period prior to her last day of work on August 10, 2010, Plaintiff fails to identify any evidence detailing an instance in which she asked for an accommodation or showing that an accommodation was so obviously required before that time. Indeed, while Plaintiff testified that she had long-standing issues with anxiety and depression, Plaintiff has insisted that she did not believe those mental conditions compromised her ability to perform the functions of her custodian position or was responsible for any of the disciplinary counselings or write-ups she received. (*See* Pl. Dep. 112-113). Thus, the City is also entitled to summary judgment on this alternative basis as it relates to Plaintiff's accommodation claim for the period prior to her last day of work.

Plaintiff emphasizes that the City did eventually become aware that she was seeking an accommodation. In support, she relies primarily upon Dr. Bell-Shambley's Fitness for Duty report dated September 24, 2010. In that report, Dr. Bell-Shambley recommended that Plaintiff "be off work," based on her assessment that Plaintiff's anxiety and depression "compromise her tolerance for frustration, interpersonal communication and concentration" and rendered her "emotionally fragile and too unstable to return to work at the present time." What Plaintiff seizes upon, however, is Dr. Bell-Shambley's suggestion noted immediately thereafter that "if [Plaintiff's] employer felt there was any basis to her complaints about specific individuals,

25

reassignment might be a consideration."  In addition, Plaintiff also seems to rely on her deposition testimony from December 2011, in which she articulates the two types of accommodation she claims she was denied, as discussed above.

The City responds by pointing out that Dr. Bell-Shambley's report came more than a month after Plaintiff had stopped working.  Plaintiff's deposition likewise came more than a year after that report.  The City also emphasizes that Dr. Bell-Shambley's report does not actually offer an opinion that Plaintiff would likely be able to work if she were transferred to another position, assuming one was even available.  Further, the City insists that Dr. Bell-Shambley's report and Plaintiff's deposition testimony notwithstanding, Plaintiff's receipt of SSDI benefits for the entire period since she stopped working demonstrates that she has not been a "qualified individual" for ADA purposes at any time since.

The court would note that the fact that the SSA deemed Plaintiff eligible for SSDI benefits does not judicially estop or otherwise necessarily preclude Plaintiff from proving that, during that same time frame, she was *also* a "qualified individual" within the meaning of the ADA.  *See Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 801-05 (1999); *Taylor v. Food World, Inc.*, 133 F.3d 1419, 1423 (11th Cir. 1998); *Talavera v. School Bd. of Palm Beach County*, 129 F.3d 1214, 1219-21 (11th Cir. 1997); *Kurzweg v. SCP Distributors, LLC*, 424 Fed. App'x 840, 843-44 (11th Cir. 2011).  In order to be eligible for SSDI benefits, a claimant must generally allege and prove that she is "disabled," meaning that she has a physical or mental impairment that "'of such severity that [she] is not only unable to do [her] previous work but cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'"  *Cleveland*, 526 U.S. at 803

(quoting 42 U.S.C. § 423(d)(2)(A)).  However, the Supreme Court has identified several ways that an ADA plaintiff might be able to perform the essential functions of a job but still be deemed "disabled" by the SSA.  First, an SSDI applicant might be able to perform the work with a reasonable accommodation, while the SSA does not take such possible accommodations into account when determining whether the SSDI applicant is disabled.  *See id.*, 526 U.S. at 803; *see also Talavera*, 129 F.3d at 1220.  There are also circumstances where an SSDI applicant who can actually perform work may qualify as disabled based upon the impairment listings in the SSA regulations.  *Cleveland*, 526 U.S. at 804; *Kurzweg*, 424 Fed. App'x at 844.  Finally, an SSDI applicant may fall within the agency's nine-month trial-work period used to facilitate reentry in to the workforce.  *Cleveland*, 526 U.S. at 805; *Kurzweg*, 424 Fed. App'x at 844.

Even so, Plaintiff's acknowledgments that she represented to the SSA that she was unable to work, that she has received SSDI benefits since the date that she last work, and that she has continued to receive such benefits ever since are enough to shift the burden at summary judgment to Plaintiff to explain the apparent discrepancy between her prior assertion that she is unable to work and her instant position that she is a qualified individual under the ADA.  *See Cleveland*, 526 U.S. at 806. "That explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." *Id.* at 807.  In other words,

> an ADA plaintiff may not, simply by disavowing a prior claim of total disability, perform an about-face and assert that he is a "qualified individual" who is capable of working.  Rather, . . . the plaintiff must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true, and he must demonstrate that the assertion was nonetheless

27

consistent with his ability to perform the essential functions of his job.

* * * *

Explanations of the sort *Cleveland* requires are, in short, contextual - they resolve the seeming discrepancy between a claim of disability and a later claim of entitlement to work not by contradicting what the plaintiff told the Social Security Administration, but by demonstrating that those representations, understood in light of the unique focus and requirements of the SSA, leave room for the possibility that the plaintiff is able to meet the essential demands of the job to which he claims a right under the ADA.

*Detz v. Greiner Industries, Inc.*, 346 F.3d 109, 118 (3d Cir. 2003) (quoting *Lee v. City of Salem, Ind.*, 259 F.3d 667, 674-75 (7th Cir. 2001)).

Plaintiff gives no indication that she appreciates that her application for and receipt of SSDI benefits might have any bearing on her ADA claim.  Accordingly, she does not make any clear attempt to explain why for the period since she last worked for the City she might be a qualified individual for purposes of her ADA claim despite the fact that she has been deemed unable to work by the SSA.  The only circumstance Plaintiff offers that might fit those cited by the Supreme Court in *Cleveland* as potentially allowing a finding of disability under Social Security Act and simultaneously being a qualified individual under the ADA is that Plaintiff claims that she could perform at least some jobs for the City with reasonable accommodation.[14] The court has already determined as a matter of law, however, that neither of her proposed accommodations, *i.e.*, a transfer to another position and working with someone to assist her, is "reasonable" and thus required under the ADA.  Moreover, that Plaintiff could perform all of the

---

[14]There is no indication, for example, that the SSA concluded that Plaintiff was disabled for purposes of the Social Security Act based upon a finding at step three of the review process that she met the conditions of an impairment listed in the regulations.  *See Cleveland*, 526 U.S. at 804; *Kurzweg*, 424 Fed. App'x at 844.  There is also nothing to support that Plaintiff's case has anything to do with the nine-month trial period allowed under the Social Security Act in which a claimant may continue to receive disability benefits while attempting to return to gainful work.  *See Cleveland*, 526 U.S. at 805; *Kurzweg*, 424 Fed. App'x at 844.

duties of another regular position with the City upon a simple reassignment, which is the principal accommodation she says she wants, is facially inconsistent with the proposition that Plaintiff meets the statutory definition of disability under the Social Security Act, *i.e.*, that she cannot perform any gainful work that exists in the national economy.  To the extent Plaintiff claims that she was denied an accommodation since the last day she worked, the City is also entitled to summary judgment on this alternative ground.

B.      **Count II - Retaliation**

1.      **Introduction**

In Count II of her Complaint, Plaintiff claims that the City is liable for unlawful retaliation.  According to her pleading, Plaintiff brings these claims pursuant to Title VII (Compl., ¶ 22), as well as "the Fourteenth Amendment to the U.S. Constitution, made actionable through 42 U.S.C. § 1983."  (*Id.* ¶ 1).  In connection with the City's motion for summary judgment, however, both parties brief the retaliation cause of action as having been brought only pursuant to Title VII.  The court's analysis will do the same, treating any related constitutional claims, to the extent they have been sufficiently pled in the first place, as abandoned.  *See Wilkerson*, 270 F.3d at 1322; *Coalition for the Abolition of Marijuana Prohibition*, 219 F.3d at 1326; *Resolution Trust*, 43 F.3d at 599.

The anti-retaliation provision of Title VII makes it unlawful "for an employer to discriminate against any ... employe[e]" who (1) "has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause).  42 U.S.C. § 2000e–3(a).  In order to make out a

29

prima facie case of retaliation under Title VII, a plaintiff has the burden at trial to show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse action at the hands of the employer; and (3) that there is a causal link between the protected activity and the adverse action. *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010).

The contours of Plaintiff's retaliation cause of action are less than fully clear, due to the vagueness of both her pleading and her arguments and allegations in her summary judgment brief.  Giving Plaintiff the benefit of the doubt as the non-movant, based upon the court's review of her Complaint, the incidents over which the parties seem to clash in their briefs, and the summary judgment record, the court will assume that Plaintiff is claiming the following amounted to activity protected under Title VII:

    (1)    Plaintiff's internal complaints in April 2007 regarding William Nalls's sexually explicit remark in the break room;

    (2)    her October 2007 EEOC charge, which references her complaints about the Nalls remark and her subsequent transfer to the airport;

    (3)    her December 2008 grievance filed with the City over the incident in which Plaintiff found her supervisor, Spencer, hiding in a closet in the basement in the City Hall Annex, apparently taking photos of her;

    (4)    her February 2009 EEOC charge, which references, among other things, the Spencer closet incident and the City's failure to resolve Plaintiff's grievance over that incident to her satisfaction;

    (5)    her August 2, 2010, grievance filed to contest a written reprimand she received that same day;

    (6)    certain other "informal complaints ... with the City," including "complaints she made against Jimmie Cain" (Pl. Opp. Brief at 16-17); and

    (7)    her September 2010 EEOC charge.

The court will likewise give Plaintiff the benefit of the doubt by assuming that she is

claiming that the following amounted to adverse actions or harassment based on retaliatory animus:

(1)     the reassignment to the airport in July 2007;

(2)     the reassignment to the City Hall Annex and the Municipal Court in August 2008;

(3)     one of her supervisors, Floyd Spencer, would frequently observe and closely monitor her work, both during the period she worked at the airport and when she was thereafter assigned to the City Hall Annex in August 2008, including taking photos of areas where she worked;

(4)     the incident on December 26, 2008, in which Plaintiff found Spencer hiding in closet in the basement of City Hall, apparently shooting photos or video of Plaintiff as she worked and/or of another female employee'

(5)     the reassignment to the Intermodal Facility in about October 2009;

(6)     following her transfer to the Intermodal Facility, Jimmie Cain, the manager of the Transit Authority, repeatedly complained to Plaintiff's supervisors with the City about her work, including in late 2009, January 2010, and July 2010;

(7)     beginning in about January 2010, another one of her supervisors, Jessie Hall, was constantly following her around during the day to observe and scrutinize her work;

(8)     on January 28, 2010, the City ordered her to attend mandatory EAP counseling in lieu of being suspended;

(9)     the written reprimand she received on August 2, 2010;

(10)    on August 10, 2010, Cain allegedly locked Plaintiff out of offices at the Transit Authority, preventing her from cleaning them;

(11)    also on August 10, 2010, Plaintiff was escorted to the City's Human Resources Department in City Hall by one or more police officers when she became upset about being locked out of the Transit Authority offices; and, finally,

(12)    the City's failure to reinstate her to active employment.

31

At the outset, the City argues that Plaintiff cannot recover for many of the acts she has referenced because, the City contends, Title VII claims based on those acts are barred by the statute of limitations.  Title VII requires a plaintiff in Alabama to exhaust administrative remedies before filing a judicial action by filing an EEOC charge within 180 days of the alleged unlawful employment practice.  42 U.S.C. § 2000e-5(e)(1); *Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169, 1178 (11th Cir. 2005), aff'd 550 U.S. 618 (2007), *superseded by statute on other grounds*, Lilly Ledbetter Fair Pay Act of 2009, Pub.L. 111-2, as stated in *AT&T Corp. v. Hulteen*, 556 U.S. 701, 715 (2009); *see also H&R Block Eastern Enterprises, Inc. v. Morris*, 606 F.3d 1285, 1295 (11th Cir. 2010).  A plaintiff is then required to file a civil action in court based on the claims set forth in an EEOC charge no later than 90 days after receiving a right-to-sue notice on the dismissed charge.  *See* 42 U.S.C. § 2000e-5(f)(1); *Santini v. Cleveland Clinic Florida*, 232 F.3d 823, 825 & n. 2 (11th Cir. 2000).  Judicial claims not filed within these time constraints are subject to dismissal.

It is undisputed that Plaintiff did not bring this suit until more than a year after the dismissal of her 2009 EEOC charge and more than three years after the dismissal of her 2007 EEOC charge.  Rather, she acknowledges that this action is timely only as to her third and final EEOC charge, filed September 20, 2010.  The City argues, therefore, that Plaintiff is precluded under the statute of limitations from recovering for any "incidents" that occurred more than 180 days before she filed her third EEOC charge, *i.e.*, March 25, 2010.  (Dft. Summ. J. Mot. at 26).  Plaintiff does not responded to this argument in her brief.

A plaintiff may not recover under Title VII for an "unlawful employment practice" that occurred outside of the limitations period.  42 U.S.C. § 2000e-5(e)(1); *National R.R. Passenger*

*Corp. v. Morgan*, 536 U.S. 101, 112-14 (2002).  Practically speaking, that means that claims

based upon "discrete discriminatory or retaliatory acts" occurring outside the limitations period

are necessarily barred.[15]  *Morgan*, 536 U.S. at 122; *see also United Air Lines, Inc. v. Evans*, 431

U.S. 553, 558 (1977); *Chambless v. Louisiana-Pacific Corp.*, 481 F.3d 1345, 1349-50 (11th Cir.

2007); *Ledbetter*, 421 F.3d at 1178-79.  Such description encompasses actions "'like termination,

failure to promote, denial of transfer, or refusal to hire,' [that are] discrete in time, easy to

identify, and-if done with the requisite intent-independently actionable."  *Lebetter*, 421 F.3d at

1179 (quoting *Morgan*, 536 U.S. at 114).  In other words, a "discrete act" means "discrimination

that is actionable by itself – what the Supreme Court has recently called a 'freestanding

violation.'"  *Lapka v. Chertoff*, 517 F.3d 974, 982 (7th Cir. 2008) (quoting *Ledbetter*, 550 U.S. at

636).  "The essence of a discrete act ... is that it forms "a separate actionable 'unlawful

employment practice.'"  *Id.* (quoting *Morgan*, 536 U.S. at 114).  In this vein, an act is

independently actionable as unlawful retaliation under Title VII if "a reasonable employee would

have found the challenged action materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation

marks and citation omitted).

On the other hand, the Eleventh Circuit has recently confirmed that Title VII also

authorizes a cause of action for a hostile work environment based upon retaliatory harassment.

*Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012).  "To establish a hostile work

---

[15]Even if a claim based on a particular adverse act is time barred and thus not itself actionable, however, the
circumstances surrounding the underlying act may be admissible as background evidence in support of a timely claim.  *Morgan*,
536 U.S. at 113; *Evans*, 431 U.S. at 558.

environment claim under Title VII, the plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* at 1311 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)).  Where a plaintiff is proceeding under a "hostile environment" theory, recovery may be had for non-discrete acts occurring outside the limitations period provided that they form part of a single hostile work environment that included at least one act occurring within the limitations period.  *See Morgan*, 536 U.S. at 116-17; *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 970-71 (11th Cir. 2008); *Chambless*, 481 F.3d at 1349-50.

The court agrees with the City to the extent that it claims entitlement to summary judgment as to all retaliation claims based on "discrete acts" occurring before March 25, 2010, *i.e.*, more than 180 days before Plaintiff filed her third EEOC charge.  That means to the extent that Plaintiff may be asserting that any of the adverse acts that occurred prior to that date are sufficiently materially adverse as to be actionable under Title VII standing alone, all such claims are time barred.  At least some of Plaintiff's claims clearly fit that description.  Most notably, her three involuntary reassignments, the last of which occurred in October 2009, are all discrete acts. *See Morgan*, 536 U.S. at 114-15 ; *Ledbetter*, 421 F.3d at 1178-79; *Davis*, 516 F.3d at 970-71; *Rogers v. Georgia Dep't of Corr.*, 2012 WL 5398804, *5-6 (M.D. Ga. Nov. 2, 2012). Accordingly, the City is entitled to summary judgment on all claims alleging that such transfers

amounted to unlawful retaliation.[16]

It may be that other acts occurring before March 25, 2010, also qualify as "discrete" so as to be independently actionable under *Burlington Northern*.  For example, it is at least arguable that disciplinary counselings and write-ups occurring before that date, including the mandatory referral to the EAP on January 28, 2010, count as discrete acts and that associated claims based on them individually are time barred.  However, it is also arguable that the incidents other than the involuntary transfers amounted to non-discrete acts of "harassment" for which Plaintiff is seeking to recover under a hostile environment theory.  Admittedly, to the extent that she has sought to do so, Plaintiff's pleading and brief are inartful and oblique; nowhere has she used the terms "hostile" or "environment" or "workplace."  Nor does she expressly mention the familiar "severe or pervasive" standard used to evaluate the actionability of harassment based on a protected characteristic.  Nonetheless, Plaintiff states in her Complaint that she endured "ongoing harassment and intimidation," including "numerous write-ups and multiple threats of termination since she filed her [2007 and 2009 EEOC charges]."  (Compl. ¶¶ 9-10).  She similarly argues in the brief that she "was retaliated against over and over for her protected activity," (Pl. Opp. Brief at 18), claiming that "she was reassigned multiple times[17] and harassed as a result of filing [her]

___

[16]Plaintiff at times also references the fact that she applied with the City regarding several other posted job vacancies but was turned down each time.  It does not appear that Plaintiff is claiming her rejection on those occasions was retaliation for engaging in protected activity.  Indeed, Plaintiff acknowledges that the last such rejection was in December 2006, several months before Plaintiff says she first engaged in any form of protected activity  by complaining internally about William Nalls's sexually explicit remark in April 2007.  Of course, that timeline would preclude Plaintiff from proving that any of those denials was retaliatory.  For good measure, Plaintiff admits in her deposition she has no evidence that her non-selection for those position was for an improper reason.  (Pl. Dep. at 186-89).  Even setting those problems aside, any such claims would clearly involve discrete acts that occurred many years before March 25, 2010.  Therefore, they are time barred as well.

[17]Plaintiff cannot recover for untimely discrete acts, including her involuntary transfers, as part of a hostile environment theory or otherwise.  *See Morgan*, 536 U.S. at 113 ("Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").  However, a jury may still "*consider* discrete acts as part of a hostile work environment," so as to allow a plaintiff to recover for non-discrete acts of harassment that occurred outside of the limitations period.  *Gowski*, 682 F.3d at 1312-13 (emphasis original).

EEOC charges, complaints, and grievances against her supervisors," including that she was "closely monitored, followed and observed."  (*Id.* at 16-17 (footnote added)).  "These actions," she asserts, "constituted material changes to the privileges and conditions of Plaintiff's employment."  (*Id.* at 16).  Such instances of "harassment" that are themselves relatively minor but occurred repeatedly and impart no direct economic consequences are typically the very stuff of hostile environment claims.  *See Ledbetter*, 550 U.S. at 638; *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008).

For the sake of convenience, however, the court will not attempt to formally resolve whether Plaintiff has sufficiently raised and argued a hostile environment theory or whether she might recover thereunder for certain instances of alleged "harassment" that occurred before March 25, 2010.  Rather, the court will simply assume, for purposes of summary judgment, that Plaintiff is asserting such a theory.  The court will then analyze the merits of her retaliation claims based on the incidents of alleged harassment, both individually and collectively, rather than rely on a limitations period defense.

Turning, then, to the substance of Plaintiff's retaliation claims, she has no direct evidence that the City was motivated to take any action against her based on protected activity.  Indeed, Plaintiff has not offered evidence that anyone with whom she worked made a statement even suggestive of an animus associated with any complaints or charges she might have made, statutorily protected or otherwise.  Nonetheless, Plaintiff argues she can prove her retaliation claims by circumstantial evidence.  Those claims are thus subject to the familiar burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See Brown*, 597 F.3d at

36

1181-82.  Under that framework, if Plaintiff is able to make out a prima facie case sufficient to raise an inference that the City took adverse action against her because she engaged in protected activity, the employer must then point to evidence that its action was motivated by some legitimate reason that does not violate Title VII.  *Id.*  If the employer does so, in order for Plaintiff to defeat the motion for summary judgment, she must point to evidence from which a jury might reasonably infer that City's proffered explanations are merely a pretext to hide its unlawful retaliatory animus.  *Id.*

The City takes the position that Plaintiff cannot establish any of the three elements of a prima facie case of retaliation, *i.e.*, statutorily protected activity, legally cognizable adverse action, and a causal nexus between the two.  The City also contends that any employment actions about which Plaintiff complains were taken for lawful reasons that Plaintiff cannot show are a pretext for retaliation.  In response, Plaintiff's briefing on her retaliation claims is devoted mostly to arguing that her EEOC charges and her complaints and grievances made to the City were statutorily protected.  (Pl. Opp. Brief at 15-17).  Plaintiff also says that a causal nexus between protected activity and adverse action at the prima facie stage can be shown by a close temporal proximity between them.  (*Id.* at 17-18).  She notably fails, however, to analyze the relationship between any particular activity on her part and any specific action taken against her. (*Id.*)  Instead, she is content to state baldly that "it is clear that Plaintiff was retaliated against over and over for her participation in protected activity, and for her opposition of unlawful employment practices."  (*Id.* at 18).

The City first maintains that none of Plaintiff's activities were protected. The City's argument is premised on the theory that none of her complaints, whether made as an EEOC

charge or as an internal complaint or grievance, is protected unless founded upon a belief that is both subjectively in good faith and objectively reasonable that the employer's challenged conduct violates Title VII.  The City is correct that activities under the opposition clause, which generally covers internal employee complaints and grievances that are unconnected to a pending EEOC investigation are not protected unless the complaint is based that on a belief, that is both objectively reasonable and subjectively in good faith, that employer's challenged action violates Title VII.  *See Dixon v. The Hallmark Companies*, 627 F.3d 849, 857 (11th Cir. 2010); *Little v. United Techs., Carrier Transcold Div.*, 103 F.3d 956, 960 (11th Cir. 1997).

Under that rule, the City is correct that at least Plaintiff's internal complaint about Nalls's sexually explicit remark in the break room in April 2007 was not protected.  While offensive, the remark was an isolated incident and was not even directed at Plaintiff.  It comes nowhere close to being severe or pervasive enough to be actionable under Title VII, and no objectively reasonable person could have thought otherwise in light of well-established precedent.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271-72 (2001))).  *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008).

The court likewise concludes that Plaintiff's vaguely described "informal ... complaints made to the City" (Pl. Opp. Brief at 16), including "complaints she made about Jimmy Cain" (*id.* at 17), were not protected under the opposition clause.  Unfair treatment absent discrimination because of race, sex, national origin, religion, is not an unlawful employment practice under Title VII.  *See Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266-67 (11th Cir. 2010).  Thus, the anti-retaliation statute does not offer protection for whistleblowers or disgruntled employees of all types, and it does not insulate employees from the consequences of opposition

to treatment the employee characterizes as merely unfair or warranted generally speaking.  *See Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995).  To that end, Plaintiff has failed to present any evidence as to the substance of any other "informal complaints," against Cain or otherwise; to whom they were made; or when.  Accordingly, there is insufficient evidence to support that they were opposition to mistreatment based on a protected characteristic or were based on an objectively reasonable belief that any underlying adverse action violated Title VII.

It is less certain, however, whether Plaintiff's other complaints, in particular her EEOC charges, might not have been protected.  Plaintiff affirmatively argues that the "reasonable, good-faith belief" standard applies to assess the protected status of her complaints, drawing no distinction between her EEOC charges and her internal complaints.  Despite that, there is precedent in this circuit indicating, if not holding, that an EEOC charge may qualify as protected under the *participation* clause even the charge is unsupported by an objectively reasonable belief that the employer's conduct violated Title VII.  *See Booth v. Pasco County, Fla.*, 829 F. Supp. 2d 1180, 1200-01 (M.D. Fla. 2011); *Pettway v. American Cast Iron Pipe Co.*, 411 F.2d 998, 1007 (5th Cir. 1969) (recognizing that an employee may not be discharged because he has filed an EEOC charge that contained "malicious material," provided that, if "disregarding the malicious material," the writing "otherwise satisfies the liberal requirements of a charge."); EEOC Compliance Manual, § 8-II(C)(1)(2) ("Courts have consistently held that a respondent is liable for retaliating against an individual for filing an EEOC charge regardless of the validity or reasonableness of the charge."); *cf. EEOC v. Total System Services, Inc.*, 221 F.3d 1171, 1174-76 (11th Cir. 2000) (citing *Pettway* for the proposition that "false statements made in the context of

39

an EEOC charge (per the participation clause) are protected and cannot be grounds for dismissal or discipline"); *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1454-55 (11th Cir. 1998) (flagging the instant issue but declining to resolve it); *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999) (further discussing the breadth of protection under the participation clause).

The court has some doubts about whether one or both of Plaintiff's grievances were actually protected under the opposition clause.  Even so, the court will simply assume for purposes of the motion that both of her grievances and all three of her EEOC charges were protected.  Despite that, the City is entitled to summary judgment on all retaliation claims.  Specifically, Plaintiff cannot show that she suffered any harassment or materially adverse consequences that a jury could find was caused by a retaliatory animus and was otherwise legally actionable.

First, even assuming that the claims based Plaintiff's respective reassignments in July 2007, August 2008, and October 2009 were not time barred, Plaintiff cannot prove a causal nexus between her protected activity and those transfers.  Plaintiff attempts to show causation for all instances of adverse treatment based solely upon their temporal proximity.  In order to do so, however, the temporal relationship between the protected activity and the adverse action must be "'very close,'" generally less than three months. *Brown*, 597 F.3d at 1182 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2008) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))).  Of course, a plaintiff must at a minimum show that the adverse act followed the protected conduct. *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999).  One must also be able to infer that the supervisor or other employee causing the

adverse act was aware of the protected conduct.  *See McCann*, 526 F.3d at 1376.

Plaintiff's first transfer, to the airport, was in July 2007.  That precedes her earliest protected activity, the October 2007 EEOC charge.  Therefore, that transfer could not have possibly been related to protected activity.  The protected activity nearest in time and preceding the August 2008 transfer was also Plaintiff's October 2007 EEOC charge, a span of about ten months.  The nearest such activity preceding the October 2009 transfer was her second EEOC charge, filed in February 2009, a span of about seven months.  Neither of those transfers are sufficiently close in time to protected activity to infer causation.  *See Brown*, 597 F.3d at 1182.  In addition, the City has proffered evidence that each of her reassignments was prompted by business considerations regarding how to deploy its broader janitorial workforce most efficiently after the City had acquired additional office space.  (Doug Aff. at 2-4).  Plaintiff concedes that she has no evidence to contest that explanation as pretextual.

Plaintiff also emphasizes in her deposition that she was harassed by Jimmie Cain, the manager of the Transit Authority.  Such allegedly started sometime after Plaintiff transferred to the Intermodal Facility in October 2009 and primarily took the form of close scrutiny of Plaintiff's work and repeated complaints to Plaintiff's supervisors with the City, resulting in counselings and write-ups.  Plaintiff also charges that, on her last day of work on August 10, 2010, Cain locked her out of offices in the Transit Authority space, preventing her from cleaning them.  Plaintiff, however, has offered no evidence that Cain was actually responsible for locking her out of anywhere.  More to the point, Plaintiff presents nothing to support that Cain had knowledge of her protected activity.  Without such evidence, Plaintiff she cannot show that any

41

act or omission by Cain was in retaliation for protected activity.[18]  For one thing, Transit Authority is an agency of Tuscaloosa County, not the City; the Transit Authority merely leased office space at the Intermodal Facility owned by the City.  Thus, Cain was not a City employee, making it unlikely that he would have had reason to know of any protected complaints that Plaintiff made against the City.  Second, before being transferred to clean the Transit Authority in October 2009, Plaintiff has not shown that she engaged in any protected activity since filing her second EEOC charge in February 2009, making Cain's alleged "harassment" temporally remote, even assuming her knew about it.  Plaintiff also has not shown that any of Cain's complaints to Plaintiff's supervisors was made in bad faith, even if Plaintiff viewed such complaints as unreasonable or unfair.  Accordingly, Plaintiff cannot recover for any of Cain's alleged harassment, whether as discrete acts or as part of a hostile environment theory.

Plaintiff also cannot show that any type of disciplinary action the City took against her during that same period (or any other, for that matter) was motivated by a retaliatory animus. Plaintiff seems to complain now about being counseled and sent to mandatory EAP counseling in late January 2010, in lieu of being suspended.  She also seems perhaps to suggest that her written reprimand on August 2, 2010, amounted to retaliatory harassment.  However, prior to those events, Plaintiff had not engaged in any protected activity since filing her second EEOC charge in February 2009.  Such remoteness between that the time of the activity and the adverse actions at issue precludes a causal inference.  *See Brown*, 597 F.3d at 1182.  Furthermore, Plaintiff acknowledges that those adverse actions were prompted, at least in part, by complaints that she

---

[18]Plaintiff goes to some lengths to argue that, even though Cain was not a City employee, Plaintiff reasonably believed that he was and that the City is therefore "liable to Plaintiff for Cain's acts and omissions."  (Pl. Opp. Brief at 9, ¶ 8; *id.* at 10, ¶¶ 3, 4, 5).  However, such issues are immaterial here.  Even if Cain was a City employee, none of his actions could be retaliatory for Title VII purposes unless he knew of prior protected activity.  Plaintiff offers nothing to show that he did.

admits Cain made about her work and by her reaction thereto as expressed to her City supervisors.  Plaintiff has also failed to show that any of the City's written reasons for giving her the write-up on August 2, 2010, denying her associated grievance challenging it, or for giving any other counselings amounted to pretext.  In short, she offers nothing to indicate that the City's explanation for imposing any disciplinary action was not made honestly and in good faith, which is Plaintiff's burden at the pretext stage.  *See Total System Services*, 221 F.3d at 1176.  Plaintiff cannot recover for any of this conduct as alleged retaliation.

Plaintiff's brief also attaches some significance to the fact that, on her last day of work, as she was walking from the Intermodal Facility to see Dawn Barnes in the Human Resources Department, she was escorted on that brief journey to City Hall by one or more police officers employed by the City.  Plaintiff speculates that someone with the City "sent" the police to do so.  She concedes, though, that she has no evidence of that.  Further, by Plaintiff's own admission, before being met by police, she had been "upset" to the point of "yelling and screaming," first at Barnes over then phone and then again at Floyd Rice, when she saw him that morning.  Any suggestion that the involvement of police was caused by protected complaints is unfounded.

The only other allegations of supposed "harassment" that Plaintiff discusses are that she "was closely monitored, followed, and observed as retaliation for her participation in protected activities."  (Pl. Opp. Brief at 17).  The court will assume that reference to encompass evidence of the following: (1) Plaintiff says she often noticed Spencer monitoring and checking up on her work, first and the airport and continuing after she was reassigned to the City Hall Annex, (2) the December 26, 2008, incident in which Plaintiff discovered Spencer hiding in the closet in the City Hall Annex basement, holding a camera; and (3) Plaintiff claims that she later was

constantly followed around while she worked by another supervisor, Jessie Hall, during the period she was assigned to the Intermodal Facility.

Plaintiff cannot recover for any of this monitoring-type conduct. First, there is insufficient evidence to support that any of it was caused by Plaintiff's protected complaints. In particular, there is no evidence that the supervisors involved were aware of Plaintiff's protected activity, and there is also insufficient evidence of temporal proximity. It is unclear exactly when Spencer allegedly started monitoring Plaintiff's work activities, and any monitoring by Hall around January 2010 would have been almost a year removed from her February 2009 EEOC charge. But even assuming a retaliatory motive could be inferred, the type of monitoring Plaintiff describes is neither sufficiently adverse and material to be actionable as discrete events nor severe or pervasive enough to constitute a hostile work environment. The fact that Plaintiff's supervisors were closely scrutinizing her work or were routinely checking up on her to ensure that she was properly performing her cleaning duties is an ambiguous form of adverse treatment at best. Plaintiff may have felt put upon or singled out. However, employers are, of course, generally permitted to check up on their employees during work hours, especially where, as undisputedly was the case here, an employee has been the subject of multiple complaints regarding her performance. *See Woods v. Escambia County Utilities Auth.*, 149 Fed. App'x 863, 866-67 (11th Cir. 2005). She has not pointed to any other employees with similar complaints against them who were treated more favorably. Further, it is far from unknown for employees to be in an environment, as with a work crew or otherwise, where a supervisor is present nearby at all times. Increased scrutiny of an employee's job performance in the wake of protected activity may be evidence of a retaliatory motive, in connection with a claim that the employee thereafter

44

terminated or disciplined an employee, ostensibly for work misconduct.  *See Hamilton v. General Elec. Co.*, 556 F.3d 428, 436-37 (6th Cir. 2009).  Such monitoring, however, has generally been deemed not actionable in itself.  *See, e.g., Davis v. United States Postmaster Gen.*, 190 Fed. App'x 874, 875-76 (11th Cir. 2006) (plaintiff's allegations that included "monitoring his work excessively," "paging him throughout the day," "preventing him from talking to other co-workers," and "closely monitoring his movements at work" not actionable under Title VII); *Harbuck v. Teets*, 152 Fed. App'x 846, 847-48 (11th Cir. 2005) (plaintiff's assertion that she had "been subject to heightened scrutiny [by her employer] since her deposition in her previous EEOC complaint" did not show a materially adverse action for purposes of Title VII); *O'Brien v. Department of Agriculture*, 532 F.3d 805, 809-10 (8th Cir. 2008) (supervisor's actions of verbally harassing two employees and increasing his scrutiny of their work following one employee's filing of EEOC charge were not sufficiently severe or pervasive so as to show hostile work environment); *cf. Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1247-48 (11th Cir. 1999) (en banc) (incidents that included harasser's making sniffing noises while staring at plaintiff's groin and "constant" following and staring at the plaintiff in a "very obvious fashion" over an 11-month period insufficient to support a hostile environment claim because of sex).

Admittedly, the December 26, 2008, incident in which Plaintiff discovered Spencer hiding with a camera in a closet in a secluded area of the basement in City Hall is exceedingly strange, if not even a bit creepy.  That is so regardless of whether he did or did not actually photograph Plaintiff.  She might have even felt physically threatened, at least briefly.  Nonetheless, Plaintiff acknowledges that she had almost no contact and had no more problems with Spencer following that incident, and he stopped working for the City entirely in April 2009.

45

Ultimately, the court concludes that Plaintiff cannot show that such incident or the more conventional monitoring of her work amount to actionable retaliation.

Finally, although it is not entirely clear that such is the case, Plaintiff also may be attempting to claim that the City retaliated by failing to put her back to work since her last day on August 10, 2010.  It is doubtful that she has pled such a cause of action.  Nonetheless, the court will assume both that she has done so and that she is making such a claim now.  Specifically, Plaintiff's brief cites her third EEOC charge as activity protected under Title VII.  (Pl. Opp. Brief at 16).  That charge was filed more than a month after her last day of work; it could have no possible link to any act or omission by the City other than to one relating to its refusal to reinstate her.  Even so, to establish a prima facie case on a claim alleging a failure to rehire or reinstate, Plaintiff would have to show, among other things, that she applied and was qualified for an available position.  *See McDonnell Douglas*, 411 U.S. at 802; *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806 & n.5 (11th Cir. 1995).  For the reasons discussed in connection with her ADA count, there is no genuine issue of fact respecting whether Plaintiff has been qualified for any available position with the City at any time since her last day of work.  Accordingly, the City is entitled to summary judgment on any retaliation claim associated with the failure to reinstate Plaintiff.

### C.    Count III - Outrage

Finally, Plaintiff's third count is captioned, "Mental and Emotional Distress."  She alleges in connection therewith that the City's actions underlying her disability discrimination and retaliation claims "were intentional and inflicted ... severe mental and emotional distress." (Compl. ¶ 24).  Plaintiff's counsel has clarified that this count is intended to state a claim under

46

Alabama law for the tort of "outrage" (Pl. Dep. at 16-17; Pl. Opp. Brief at 18), otherwise known as intentional infliction of emotional distress.  *See Ex parte Bole*, 103 So. 3d 40, 52 (Ala. 2012).

The Alabama Supreme Court has explained as follows with regard to this cause of action:

[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and for bodily harm resulting from the distress.  The emotional distress thereunder must be so severe that no reasonable person could be expected to endure it.  Any recovery must be reasonable and justified under the circumstances, liability ensuing only when the conduct is extreme. By extreme we refer to conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

* * *

The tort of outrage is an extremely limited cause of action. It is so limited that this Court has recognized it in regard to only three kinds of conduct: (1) wrongful conduct in the family-burial context; (2) barbaric methods employed to coerce an insurance settlement, and (3) egregious sexual harassment.  In order to recover, a plaintiff must demonstrate that the defendant's conduct "(1) was intentional or reckless; (2) was extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it.

*Bole*, 103 So. 3d at 52 (citations and internal quotation marks omitted).

For reasons previously stated, Plaintiff cannot prove the substantive allegations underlying her outrage claim, that is, that the City unlawfully discriminated because of disability and retaliated for her protected complaints.  Having disposed of those claims, the court need not separately analyze Plaintiff's claim for the tort of outrage.  *See Hawn v. Shoreline Towers Phase 1 Condominium Ass'n, Inc.*, 347 Fed. App'x 464, 469 (11th Cir. 2009).  Suffice it to say that Plaintiff's proof fails to support that the City might be liable under this state-law theory either. *See Shepherd v. Summit Mgmt. Co.*, 726 So. 2d 686, 694(Ala. Civ. App. 1998); *Short v. Mando American Corp.*, 805 F. Supp. 2d 1246, 1277 (M.D. Ala. 2011).  The City is thus entitled to

47

summary judgment on this claim.

## IV.    CONCLUSION

Based on the foregoing, the City's motion for summary judgment (Doc. 22) is due to be

**GRANTED**.  A separate final order will be entered.

**DONE**, this 14th day of February, 2013.

*John E. Ott*
_____
**JOHN E. OTT**
Chief United States Magistrate Judge

48